UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CNH AMERICA, LLC,

      Plaintiff,

v.                                  Case No. 09-10584
                                       Honorable Patrick J. Duggan

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA,

      Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on July 10, 2009.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                  U.S. DISTRICT COURT JUDGE

On August 26, 2008, Plaintiff CNH America, LLC ("CNH" or "company")

initiated this action against Defendant International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America ("UAW" or "union"). In its

Complaint, CNH alleges that the UAW breached the terms of a collective bargaining

agreement which CNH claims released it of liability for certain retiree health insurance

benefits. CNH further alleges that the UAW misrepresented its authority to enter into the

agreement on behalf of the retirees. Specifically, CNH asserts the following claims in its

Complaint: (I) breach of a collective bargaining agreement in violation of § 301 of the

Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; (II) breach of an implied warranty of authority in violation of Wisconsin law; (III) intentional misrepresentation in violation of Wisconsin law; and, (IV) negligent misrepresentation in violation of Wisconsin law.

Presently before the Court is the UAW's motion to dismiss CNH's Complaint, filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion has been fully briefed. On June 22, 2009, this Court held a motion hearing.

## I.   Applicable Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 555, 570, 127 S. Ct. 1955, 1964-65 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, – U.S. – , 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct at 1966).

As the Supreme Court recently provided in *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

2

claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts "to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65).

## II.    Factual and Procedural Background

This case emanates from a class action lawsuit that certain retirees and surviving spouses of retirees filed against CNH and El Paso Tennessee Pipeline Company ("El Paso") in 2002: *Yolton v. El Paso Tennessee Pipeline Co.*, Case No. 02-75164 (E.D. Mich) ("Yolton"). In *Yolton*, the plaintiffs claim that they are entitled to fully-funded, lifetime retiree health insurance benefits based on collective bargaining agreements between the retirees' former employer and the UAW and that CNH and El Paso are liable for the cost of those benefits above a certain "cap." Before the *Yolton* lawsuit was filed,

3

the UAW and the retirees jointly sued CNH and El Paso.  *UAW v El Paso Tennessee Pipeline Co.*, Case No. 02-74276 (E.D. Mich.)  That previous action, however, was voluntarily dismissed by the plaintiffs.  Although the UAW is not a plaintiff in the pending *Yolton* case, CNH contends that the union nevertheless has been funding the litigation.

In *Yolton*, CNH has asserted that the plaintiffs are barred from recovering the above-cap cost of their health care benefits from the company based on an agreement between the UAW and CNH in connection with their 1998 collective bargaining negotiations, which became an attachment to their 1998 Collective Bargaining Agreement.[1]  (*See* Compl. Ex. 1 Att. F.)  CNH contends that, pursuant to this agreement, it paid $24.7 million into a Voluntary Employee Benefit Association trust created to defray the cost of health insurance premiums for certain retirees (i.e. the "Pre IPO retirees").[2]  CNH further contends that, in exchange, the UAW promised to release CNH of any liability for the future cost of the retirees' benefits.  CNH maintains that, at all times during the 1998 negotiations, the UAW represented itself as the bargaining agent for the retirees, with authority to enter into the agreement (hereafter "VEBA

---

[1]The agreement in fact was between the UAW and the "Case Corporation."  This Court held in *Yolton*, however, that CNH is merely a continuation or alter ego of Case.  *Yolton*, Case No. 02-75164, 2008 WL 2566860 (E.D. Mich. March 7, 2008).  Therefore, to avoid confusion, the Court will refer to the company that entered into the 1998 agreement with the UAW as CNH.

[2]In its pleadings, CNH refers to these retirees as the "Pre-Reorganization Retirees."  The Class in *Yolton* includes these retirees, as well as the surviving spouses of the retirees.  For ease of reference, and because the parties know well whose benefits this case and *Yolton* concern, the Court will simply use "retirees."

Agreement"). The *Yolton* plaintiffs have responded to CNH's "accord and satisfaction" defense arguing that the UAW lacked the authority to bargain away their vested benefits. This issue remains pending before this Court in *Yolton*.

In the meantime, CNH filed the present action seeking to hold the UAW liable for allegedly misrepresenting its authority to enter into the VEBA Agreement on behalf of the retirees during the 1998 negotiations. CNH alleges in its Complaint that, at all times during the 1998 negotiations, the UAW presented itself as the bargaining agent for the retirees, with full authority to enter into the agreement that was reached, and that CNH reasonably relied on the UAW's authority. CNH claims that the UAW breached the VEBA Agreement by suing the company and funding litigation that seeks to hold the company liable for the above-cap cost of the retiree health insurance benefits.

Regardless of the outcome of the remaining issue in *Yolton*, CNH contends that the UAW is liable for substantial monetary damages. If the *Yolton* plaintiffs prevail, CNH argues that it will have been deprived of the benefit of its $24.7 million bargain. If CNH prevails, it argues that it will have lost millions of dollars in attorneys' fees and litigation costs as a result of the UAW's sponsorship of the *Yolton* lawsuit in direct contravention of the release.

## III.  Analysis

In its pending motion to dismiss, the UAW argues that each of the claims that CNH asserts in its Complaint fails as a matter of law. As indicated above, these claims are: (I) breach of the 1998 agreement in violation of the LMRA; (II) breach of an implied

warranty of authority in violation of Wisconsin law; (III) intentional misrepresentation in violation of Wisconsin law; and, (IV) negligent misrepresentation in violation of Wisconsin law.

**A.    Breach of the VEBA Agreement in Violation of the LMRA**

The VEBA Agreement provides, in relevant part:

> During the 1998 negotiations, the Company and Union had extensive discussions of the medical plan maintained by El Paso Natural Gas Company for pre IPO retirees.  Although these retirees retired prior to the formation of Case and sales of its stock to the public, Case has agreed with the UAW to create a VEBA and to fund it with $24,700,000 in order to pay a portion of the cost of benefits above the cost cap limit under the El Paso Plan (plus $300,000 in 1998 to pay for the 1998 Medicare Part "B" coverage).
> . . .
> The parties recognize that the VEBA is intended to complete Case's funding of the above cap cost and that Case will not be required to make any further contributions to the VEBA from its own funds.

(Compl. Ex. 1 Att. F.)  Relying on this language, CNH alleges in Count I of its Complaint that, in consideration for its payment of $24.7 million into the VEBA trust, the UAW released CNH of any further liability for the cost of the retirees' health care benefits. CNH further alleges that the UAW breached this release by suing it and funding the *Yolton* litigation.

The UAW raises two arguments in support of its motion to dismiss this claim. First, the UAW argues that CNH's interpretation of the agreement as a release of its liability is not plausible based on the plain language of the agreement and because CNH

could not have reasonably believed that the UAW could release the retirees' vested

benefits.  Second, the UAW argues that the common law does not permit CNH to sue the

UAW for breach of a "release."  Because the Court concludes that CNH's breach of

contract claim is precluded based on the UAW's second argument, it will address that

argument only at this time.

The UAW maintains that under the common-law and early case law, there is a

distinction between a release of liability and a covenant not to sue in that the former can

be used as an affirmative defense, only.  In this Court's review of the authority cited by

the UAW, however, the primary distinction under the common law between these two

legal instruments lies in whether joint-tortfeasors are relieved from liability (a release was

viewed as extinguishing claims against all wrongdoers; a covenant not to sue was viewed

as having no effect on the liability of other wrongdoers).  *See, e.g.,* Joseph G. Nassif,

*When is a Release Not a Covenant, Part I*, 34 Mo. B.J. 12 (1978); *Pellett v. Sonotone

Corp.*, 160 P.2d 783, 786 (Calif. 1945).  The authority cited by both parties nevertheless

is significant because it indicates that, regardless of the title assigned to the instrument,

the effect of the instrument "shall be determined in accordance with the intention of the

parties."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 345-46, 91 S. Ct.

795, 809-10 (1971); *see also Simpson*, 128 S.E.2d at 846 ("Where . . . construction is

necessary to determine whether it is a release or a covenant not to sue, the problem is to

determine the intention of the parties"); Nassif, *When is a Release Not a Covenant*, 34

Mo. B.J. at 14 ("One prime factor courts seem to look to rather consistently is the intent

7

of the parties.  Instruments in the form of releases may be construed as covenants not to sue in order to carry out the intention of the parties.  Intent has been held to govern . . .").  As they would with any contract, courts first look to the language used by the parties to determine their intent.

For example, in *Anchor Motor Freight, Inc. v. International Brotherhood of Teamsters, Local* 377, the Sixth Circuit remanded the matter to the district court to determine whether the company's action against the union was in fact filed in violation of a purported covenant not to sue and thus supported the union's counterclaim for damages incurred in defending against the company's action.  700 F.2d 1067, 1072 (6th Cir. 1983).  In *Isaacs v. Caterpillar, Inc.*, the District Court for the Central District of Illinois dismissed the company's counterclaim alleging that the plaintiffs' lawsuit breached releases they signed when their employment was terminated because the court found no language in the releases "specifically promising not to file a lawsuit, or providing for damages if a lawsuit is filed . . ., or providing for attorney's fees and costs." 702 F. Supp. 711, 713 (C.D. Ill. 1988).  The court reasoned: "Caterpillar could have drafted this release to include language giving it an offensive right of action in the event of a lawsuit. It did not include such language."  *Id*. at 714.

Turning to the present matter, nothing in the language of the VEBA Agreement suggests that it should be construed as a covenant not to sue.  The agreement mentions nothing about lawsuits or claims against CNH, let alone a promise by the UAW not to sue CNH.  Compare the language at hand with the following language from the agreement in

8

*Widener v. Arco Oil & Gas Co.*– where the court found the plaintiffs liable for the

damages the defendants incurred as a result of the plaintiffs' lawsuit:

> In consideration for the Special Payment Allowance under the
> Atlantic Richfield Special Termination Plan offered to me by
> the Company I release and discharge the Company . . . from
> all claims, liabilities, demands, and causes of action known or
> unknown, fixed or contingent, which I may have or claim to
> have against the Company as a result of this termination and
> do hereby covenant not to file a lawsuit to assert such claims.
> . . .

717 F. Supp. 1211, 1213-14 (N.D. Tex. 1989).  Also compare the language in the plant

closing agreement at issue in *Terrell v. Dura Mechanical Components, Inc.*– which the

parties in that case agreed contained a covenant not to sue and the district court concluded

was breached by the union when it funded the plaintiffs' lawsuit:

> The Union, on behalf of itself and its members, and the
> Company waive all legal claims against each other including
> claims for breach of collective agreement, ERISA, wrongful
> discharge, employment discrimination, the WARN Act,
> National Labor Relations Act or any other statute or theory of
> law.  It is the intent of the parties to resolve all potential
> claims by this plant closing agreement.

934 F. Supp. 874, 877 (N.D. Ohio 1996).  This Court must presume that the drafters of

the VEBA Agreement would have included similar language if they intended the

agreement to include an offensive right of action in the event of a lawsuit.  Absent such

language, the Court concludes that CNH is limited to employing the agreement "as a

shield rather than as a sword."  *Artvale, Inc. v. Rugby Fabrics Corp.*, 363 F.2d 1002, 2008

(2d Cir. 1966).

CNH argues that construing the VEBA Agreement in this matter "would allow the UAW to obtain plainly unjust results." (Pl.'s Mot. at 12.) According to CNH, it would derive nothing from its $24.7 million payment into the VEBA trust. The district court rejected a similar argument in *Isaacs*, reasoning that the only claim the plaintiff alleged was a claim for breach of contract and resulting damages, not a claim for restitution based on an "unjust enrichment" theory. 702 F. Supp. at 714. The same is true here and, to evaluate CNH's breach of contract claim, the Court must focus only on the intent of the parties as set forth in their express agreement.

In conclusion, because the plain language of the VEBA Agreement cannot be construed as a covenant not to sue, CNH's claim that the UAW breached the agreement by funding the *Yolton* litigation fails as a matter of law. The Court therefore grants the UAW's motion to dismiss Count I of CNH's Complaint.

> **B.      CNH's state law claims**

The UAW argues that CNH's state law claims alleging breach of implied warranty of authority (Count II) and intentional and negligent misrepresentation (Counts III and IV) are preempted by the LMRA. Alternatively, the UAW argues that CNH fails to allege facts sufficient to satisfy the elements of these claims.

> **1.      Whether the LMRA preempts CNH's state law claims**

Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a
> labor organization representing employees . . . may be
> brought in any district court of the United States having

10

jurisdiction of the parties . . .

29 U.S.C. § 185(a).  The Supreme Court has interpreted this section as conferring federal

jurisdiction over controversies involving collecting bargaining agreements, as well as

"call[ing] on the federal courts to create a uniform federal common law of collective

bargaining."  *Voilas v. Gen. Motors Corp.*, 170 F.3d 368, 372 (3d Cir. 1999) (citing

*Textile Workers Union of Am. v. Lincoln Mills*, 253 U.S. 448, 455-56, 77 S. Ct. 912, 918

(1957).  To further that goal, "the Court has held that state laws that might produce

differing interpretations of the parties' obligations under a collective bargaining

agreement are preempted [by the LMRA]."  *Id.* (citing *Local 174, Teamsters of Am. v.

Lucas Flour Co.*, 369 U.S. 95, 103-04, 82 S. Ct. 571, 576-77 (1962)).

      The Supreme Court first articulated the standard for determining when LMRA

preemption arises in *Allis-Chalmers Corp. v. Lueck*.  471 U.S. 202, 105 S. Ct. 1904

(1985).  The Court held: "[W]hen resolution of a state-law claim is *substantially

dependent* upon analysis of the terms of an agreement made between the parties in a labor

contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted

by federal labor-contract law."  *Id.* at 220, 105 S. Ct. at 1916 (internal citations omitted)

(emphasis added).  The Court reasoned:

> The interests in interpretive uniformity and predictability that
> require that labor-contract disputes be resolved by reference
> to federal law also require that the meaning given a contract
> phrase or term be subject to uniform federal interpretation.
> Thus, questions relating to what the parties to a labor
> agreement agreed, and what legal consequences were
> intended to flow from breaches of that agreement, must be

> resolved by reference to uniform labor law, whether such
> questions arise in the context of a suit for breach of contract
> or in a suit alleging liability in tort.  Any other result would
> elevate form over substance and allow parties to evade the
> requirements of § 301 by relabeling their contract claims as
> claims for tortious breach of contract.

*Id*. at 211, 105 S. Ct. at 1911.  The focus in determining whether a state law claim is

preempted, the *Allis-Chalmers* Court explained, is on whether the claim "confers

nonnegotiable state-law rights on employers or employees independent of any right

established by contract, or, instead, whether evaluation of the tort claim is *inextricably*

*intertwined* with consideration of the terms of the labor contract."  *Id*. at 213, 105 S. Ct. at

1912 (emphasis added).

In *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S. Ct. 1877

(1988), the Supreme Court further elaborated on the terms "substantially dependent on"

and "inextricably intertwined with" an analysis of the terms of a collective bargaining

agreement with respect to § 301 preemption.  Evaluating the plaintiff's state law

retaliatory discharge claim, the Court concluded that the tort claim was not preempted

because the elements of the claim– that the employee was discharged or threatened with

discharge and that the employer's motive was to deter him from exercising his statutory

rights– did not implicate the collective bargaining agreement.  *Id*. at 407, 108 S. Ct. at

1882.  The Court explained: "Each of these purely factual questions pertains to the

conduct of the employee and the conduct and motivation of the employer.  Neither of the

elements requires a court to interpret any term of a collective-bargaining agreement."  *Id*.

12

As the Court further explained, the state law claim is not "inextricably intertwined" with the terms of the collective bargaining agreement simply because the analysis of the state law claim might involve consideration of the same facts as the determination of whether the plaintiff was fired for just cause in accordance with the collective bargaining agreement.  *Id.* at 408, 108 S. Ct. at 1883.

Based on the above precedent, the Sixth Circuit Court of Appeals developed a two-part test to determine whether a state law claim is preempted by § 301 in *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033 (6th Cir. 1989).  First, the court must determine whether resolution of the claim(s) requires interpretation of the terms of a collective bargaining agreement.  *Id.* at 1037.  Second, the court must ask whether the claim(s) is based on rights created by the collective bargaining agreement or under state law.  *Id.*  If contract interpretation is not required *and* the right arises from state law, § 301 preemption is not warranted.  *Alongi v. Ford Motor Co.*, 386 F.3d 716, 724 (6th Cir. 2004).  Stated in the reverse, if contract interpretation is required *or* the claim is based on rights created by the collective bargaining agreement, the claim is preempted.  *Id.*  In the present matter, the UAW argues that CNH's state law claims only can be resolved by interpreting the VEBA Agreement and that therefore those claims are preempted.

Under Wisconsin law, "[o]ne who purports to bind another but has no authority to so act thereby becomes subject to personal liability on the basis of an implied warranty of authority."  *Martinson v. Brooks Equip. Leasing, Inc.*, 152 N.W.2d 849, 855 (Wis. 1967).  In this Court's view, whether the UAW purported to bind the retirees when it entered into

13

the VEBA Agreement with CNH and whether it had the authority to so act only can be determined by interpreting the agreement.  This is because, if the VEBA Agreement is interpreted as a release only of CNH's obligation to contribute additional funds to the VEBA trust and not as a complete release of CNH's liability for the above-cap cost of the retirees' benefits, it is not a contract binding (or purporting to bind) the retirees.  The union's power to bind the retirees– or its lack thereof– only becomes relevant if the VEBA Agreement is interpreted as a release of CNH's liability for the retirees' vested health care benefits.  The UAW only needed the consent of the retirees to negotiate the VEBA Agreement if the parties to the agreement were attempting to alter the retirees' vested benefits therein.  *Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n. 20, 92 S. Ct. 383, 398 n. 20 (1971); *Mesa v. Gen. Battery Corp.*, 908 F.2d 1262, 1271-72 (5th Cir. 1990).  The Court therefore holds that CNH's implied warranty of authority claim under Wisconsin law is preempted by § 301.

CNH's negligent and intentional misrepresentation claims under Wisconsin law require proof of these common elements: "(1) the defendant making a factual representation, (2) which was untrue, and (3) which the plaintiff believed to be true and relied on to his or her detriment."  *Grube v. Daun*, 496 N.W.2d 106, 114 (Wis. Ct. App. 1992) (citing *Whipp v. Iverson*, 168 N.W.2d 201, 203 (Wis. 1969)).  In addition, the factual misrepresentation must be "material."  *See Ramsden v. Farm Credit Servs. of North Cent. Wisconsin ACA*, 590 N.W.2d 1, 5 (Wis. Ct. App. 1998).  CNH's misrepresentation claims are based on the following alleged factual representation:

14

> [T]he UAW [intentionally/negligently] misrepresented its
> authority regarding the Pre-Reorganization Retirees by never
> communicating to CNH America that it lacked authority to
> bind the Pre-Reorganization Retirees in connection with the
> VEBA trust and release.

(Compl. ¶¶ 51, 58.)  This Court believes that the "materiality" of this alleged

misrepresentation cannot be determined without interpreting the VEBA Agreement.

As discussed above, the union's authority to represent the retirees only would have

been material *if* the VEBA Agreement was intended to release CNH of its liability for the

retirees' vested benefits.  If the VEBA Agreement is interpreted as releasing CNH only of

its future obligation to fund the VEBA trust, the UAW's alleged misrepresentation of its

authority to represent the retirees during the 1998 negotiations was not material.

Resolution of an element of CNH's misrepresentation claims– i.e. the materiality of the

UAW's alleged factual representations– therefore is "inextricably intertwined with

consideration of the terms of the labor contract."  *Allis-Chalmers*, 471 U.S. at 213, 105 S.

Ct. at 1912.  As a result, the Court concludes that CNH's misrepresentation claims also

are preempted by § 301.

It is because CNH's state law claims require interpretation of the VEBA

Agreement that the present matter is distinguishable from *Northwestern Ohio

Administrators, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018 (6th Cir. 2001)– a case on

which CNH heavily relies.  In *Walcher & Fox*, the company claimed that the union

fraudulently induced it to sign Employer Participation Agreements ("project agreements")

that incorporated the terms and conditions of a collective bargaining agreement by

15

representing that the project agreements only would cover a limited number of workers on a per job basis. *Id*. at 1022. The Sixth Circuit concluded that the company's claim only concerned the representations made by the union and its representative prior to the formation of the project agreements, "not any terms of the agreements themselves." *Id*. at 1031. It therefore held that the LMRA did not preempt the company's state law fraud claim. *Id*. The court relied on the Ninth Circuit's decision in *Operating Engineers Pension Trust v. Wilson*, in which the employer's state law claim of fraudulent inducement was premised on the union's assertion that the employer had to sign a project agreement immediately in order to continue working on a particular job. 915 F.2d 535, 536 (1990).

CNH's state law claims also are premised on representations allegedly made by the UAW prior the formation of the VEBA Agreement. However, in comparison with *Walcher & Fox* and *Wilson*, a determination of whether those representations were material or false requires interpretation of the labor agreement. In other words, the trier of fact cannot conclude that the elements of CNH's misrepresentation claims are satisfied simply by finding that the UAW represented that it had the authority to negotiate on behalf of the retirees prior to the formation of the VEBA Agreement. To decide whether that representation was false and material, the trier of fact also must conclude that the parties intended to alter the vested benefits of the retirees and determining the parties' intent requires interpretation of their agreement.

**2.      Whether CNH has adequately pleaded viable claims of breach of**

16

**an implied warranty of authority and intentional and negligent misrepresentation**

The UAW alternatively argues that CNH fails to state claims upon which relief can be granted in Counts II-IV of its Complaint. With respect to all three counts, the UAW argues that CNH fails to allege a viable claim because each claim depends upon the company's interpretation of the VEBA Agreement as releasing it of liability for the retirees' health care benefits. The UAW argues that this interpretation is not plausible based on the plain language of the agreement and because CNH could not have reasonably believed that the UAW could release the retirees' vested benefits.

With respect to the plain language of the agreement, the UAW argues that the use of "funding" to refer to CNH's future obligation for the above-cap cost of the retirees' health care benefits, demonstrates that the parties to the VEBA Agreement did not intend to release CNH of its liability for those benefits. As the UAW explains, "funding" has a particular meaning when used in the context of pension and/or welfare benefits in that it refers to the deposit of money in a trust fund to pay for those benefits. Unlike pension benefits, welfare benefits (such as the retirees' health care benefits) can be "funded" or "unfunded." Whether welfare benefits are funded or unfunded, an employer's liability for those benefits remains if they are vested.

The UAW argues that, when describing the intent of the parties with respect to the VEBA Agreement in its Complaint, CNH in fact only alleges that "[t]he parties *intended* the VEBA trust to complete CNH America's *funding* of the cost of the . . . Retirees'

17

health care benefits . . ."  (Def.'s Mot. at 12 (quoting Compl. ¶ 22) (emphasis added by Def.).)  Although acknowledging that CNH alleges elsewhere that its funding of the VEBA trust was "in consideration of a full and complete release of any further liability for CNH America with respect to the . . . Retirees' above-cap health care costs" (Compl. ¶ 21), the UAW argues that CNH alleges no facts to support this assertion.  (*Id.*)

The UAW also argues that the VEBA Agreement cannot be interpreted as releasing CNH of its liability for the retirees' vested health care benefits because the parties could not have intended this meaning.  As the UAW explains, the intent of the parties guides a court's interpretation of a collective bargaining agreement.  (Def.'s Mot. at 8 (citing *Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983).) The UAW further explains that, when the VEBA Agreement was negotiated, it was well-established that a union lacked the authority to modify the vested benefits of retirees without their consent.  *See, e.g., Pittsburgh Plate Glass*, 404 U.S. at 181 n. 20, 92 S. Ct. at 398 n. 20; *Meza*, 908 F.2d at 1271-72.  Thus the UAW argues that, absent the retirees' consent, the parties to the VEBA Agreement could not have intended the agreement to modify retiree benefits.  The UAW notes that CNH fails to allege in its Complaint that the UAW made any express representation in bargaining that it received the retirees' consent.

In response to the UAW's first argument, CNH maintains that the "ordinary" meaning of "funding"– that being, "the provision or allocation of money for a specific purpose"– supports its interpretation of the VEBA Agreement.  (Pl.'s Resp. at 5 (quoting *Black's Law Dictionary* 697-98 (8th ed. 2004).)  CNH maintains that there is no basis for

18

concluding that "funding" has any meaning but its ordinary one.  As to the UAW's second argument, CNH argues that federal labor law does not prohibit a union from representing retirees in negotiations and, absent a legal prohibition, it was reasonable for CNH to rely on common-law principles of agency to conclude that the UAW was authorized to act for the retirees during the 1998 negotiations.  CNH argues that the UAW's authority to negotiate on behalf of the retirees therefore could have been apparent or implied.

This Court finds that CNH demonstrates an ambiguity with respect to a critical term of the VEBA Agreement, such that the Court cannot conclude based only on the contract's terms whether CNH's or the UAW's interpretation represents the intent of the parties to the agreement.  CNH further demonstrates that, if the retirees' consent was implied or apparent, the parties could have intended the agreement to release CNH of any future liability for the above-cap cost of the retirees' health care benefits.  Admittedly, the question is close as to whether CNH alleges sufficient facts to make its legal conclusion that the retirees' consent was implied or apparent plausible.  The Court believes, however, that CNH's factual allegations are sufficient "to raise a reasonable expectation that discovery will reveal [additional supporting] evidence . . .." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.  For example, CNH alleges that "the UAW led CNH America to believe, and CNH America understood, that the UAW had authority to negotiate the VEBA trust and the related release on behalf of the Pre-Reorganization Retirees." (Compl. ¶ 44.)  CNH also alleges that "[t]he UAW made clear that it intended to negotiate

19

with CNH America on behalf of the . . . Retirees as well as CNH America's current UAW-represented employees." (*Id.* ¶ 18.) These allegations must be presumed true when ruling on the UAW's motion. *Erickson*, 127 S. Ct. at 2200.

With respect to CNH's intentional misrepresentation claim (Count III), the UAW also argues that CNH fails to allege facts necessary to support its assertion that the UAW had a duty to disclose its purported lack of authority to bind the retirees.

One element that a plaintiff must prove to establish an intentional misrepresentation claim under Wisconsin law is that the defendant made a factual representation. *Kaloti Enterprises v. Kellogg Sales Co.*, 699 N.W.2d 205, 211 (Wis. 2005). CNH does not allege in its Complaint that the UAW made an express statement of an untrue material fact. Instead, CNH claims that the UAW is liable for failing to disclose a material fact– specifically, that it lacked the authority to release the company of its obligation to pay the above-cap cost of the retirees' health care benefits. The UAW argues that silence is insufficient under Wisconsin law to support an intentional misrepresentation claim unless the party had a duty to disclose the fact and that CNH fails to allege facts to support a finding that the UAW had such a duty.

Under Wisconsin law, "[t]he usual rule is that there is no duty to disclose in an arm's-length transaction." *Kaloti Enterprises*, 699 N.W.2d at 212 (citing *Ollerman*, 288 N.W.2d at 99-100). However, the Wisconsin courts have held that a duty arises where the following elements are satisfied:

(1) the fact is material to the transaction; (2) the party with

20

> knowledge of that fact knows that the other party is about to
> enter into the transaction under a mistake as to the fact; (3) the
> fact is peculiarly and exclusively within the knowledge of one
> party, and the mistaken party could not reasonably be
> expected to discover it; and (4) on account of the objective
> circumstances, the mistaken party would reasonably expect
> disclosure of the fact.

*Id*. at 213.  The UAW argues that CNH has not alleged sufficient facts to support the second, third, or fourth elements and, therefore, it has not adequately pleaded that a duty to disclose arose to support its claim.

In its Complaint, CNH alleges that "the UAW had a duty to disclose to CNH America any limitations on the UAW's authority to bind the Pre-Reorganization Retirees."  (Compl. ¶ 50.)  CNH fails to set forth sufficient factual allegations, however, to support this legal conclusion.  "The question of whether the UAW had a duty to disclose . . . [is] 'an extremely complex [one] that may have factual components that make it unsuitable to address on a motion to dismiss." (CNH's Resp. at 21 (quoting *Doe v. Archdiocese of Milwaukee*, 734 N.W.2d 827, 842 (Wis. 2007).)  Nevertheless, this complexity does not relieve CNH of its obligation to comply with Rule 8's pleading requirements as recently clarified by the Supreme Court.  According to the Court: "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950.  Therefore, the Court concludes that CNH has failed to satisfy the pleading requirements necessary to state a viable intentional misrepresentation claim based on silence.

Turning lastly to CNH's negligent misrepresentation claim (Count IV), the UAW

argues that the claim fails because Wisconsin has not created a tort of negligent misrepresentation for failure to disclose.  In response, CNH cites two cases in which the Wisconsin Court of Appeals recognized such a claim.  (Pl.'s Resp. at 24 (citing *Conell v. Coldwell Banker Premier Real Estate Inc.*, 512 N.W.2d 239 (1994) and *Grube v. Daun*, 496 N.W.2d 106 (1992).)  The UAW replies that these cases neither created nor support a common law claim of negligent misrepresentation by silence because the duty to disclose in both cases was based on a state statute.  CNH also provides, however, Wisconsin's pattern jury instruction for negligent misrepresentation which indicates that a claim may be based on a party's silence and that a duty to speak may arise even when a statute does not create such a duty:

> Representations of fact do not have to be in writing or by word of mouth, but may be acts or conduct on the part of (underline)defendant(/underline), or even by silence if there is a duty to speak. [A duty to speak may arise when information is asked for; or where the circumstances would call for a response in order that the parties may be on equal footing; or where there is a relationship of trust or confidence between the parties.]

(Pl.'s Resp. Ex. 4 [2 Wis. Civil Jury Instructions Comm., *Wisconsin Jury Instructions: Civil* § 2403, at 1 (1993)].)  The Court therefore concludes that CNH's negligent misrepresentation claim does not fail as a matter of law because it is based on silence.

## IV.   Conclusion

In summary, the Court concludes that CNH's breach of contract claim under § 301 of the LMRA (Count I) fails to state a claim upon which relief can be granted because the plain language of the VEBA Agreement does not support a covenant not to sue.

22

With respect to CNH's breach of implied warranty of authority and negligent misrepresentation claims (Counts II and IV), the Court concludes that CNH has pleaded sufficient facts to state viable claims.  CNH, however, fails to plead sufficient facts to support its legal assertion that the UAW had a duty to disclose its lack of authority to negotiate on behalf of the retirees and that it therefore fails to state a viable intentional misrepresentation claim (Count III).  The Court also holds that § 301 preempts CNH's misrepresentation claim, as well as its other state law claims, because a determination of whether the elements of those claims are met is dependent upon the Court's interpretation of the VEBA Agreement.  The Court therefore holds that all of CNH's claims must be dismissed.

Accordingly,

**IT IS ORDERED**, that the UAW's motion to dismiss is **GRANTED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Bobby R. Burchfield, Esq.
Norman C. Ankers, Esq.
Julia Penny Clark, Esq.
Judith Miller, Esq.
Daniel W. Sherrick, Esq.
Michael F. Saggau, Esq.